Andrew M. Kohlmetz, OSB #955418
The Law Office of Andrew M. Kohlmetz, LLC
741 SW Lincoln Street
Portland, OR 97201
Tel: (503) 265-8307
Email: andy@portlandfederaldefense.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LUIS ARTURO BARAHONA RODAS,<br><br>Defendant. | Case No. 3:21-CR-00077-IM-06<br><br>DEFENDANT'S SENTENCING MEMO<br><br>Sentencing: May 4, 2023 at 10:00 A.M. |

## I.     BACKGROUND

On November 15, 2022, Mr. Barahona Rodas appeared before this court and pursuant to a plea agreement with the government entered a plea of guilty to Count One of the Indictment herein. Sentencing is scheduled for May 4, 2023 at 10:00 a.m.

## II.    PSR AND SENTENCING GUIDELINES CALCULATIONS

A Presentence Report ("PSR") has been prepared and reviewed by the defendant. There are no objections thereto. The PSR author calculates Mr. Barahona's total adjusted offense level is 25. The parties agree that he has no prior criminal history and falls within criminal history category I. The advisory sentencing guidelines range is 57-71 months of imprisonment.  The PSR recommends a sentence of 46 months. It should be noted that

the defendant's base offense level includes as relevant conduct the drug amounts attributable to the defendant in both federal cases as well as the now dismissed state prosecution. (see PSR at ¶ 89) Pursuant to the plea agreement, the defendant is free to request downward departures or variances from the guideline range. As argued below the defendant submits that he should receive a two-level minor role reduction pursuant to USSG 3B1.2(b). If awarded the total offense level would be 23. The corresponding guideline range would be 41-51 months imprisonment.

### III. THE DEFENDANT'S SENTENCING RECOMMENDATION

Pursuant to the plea agreement, the government has promised to recommend a low-end sentence and the defendant is free to recommend any lawful sentence. Mr. Barahona Rodas has been held in custody since his arrest on March 12, 2021. As of the date of his sentencing, he will have 25 months and 22 days of time served. By and for the reasons below, contained within the PSR and attachments, and any others that may arise at the sentencing hearing, the defendant respectfully requests a sentence of time-served to be followed by 3 years of supervised release.

### IV. ARGUMENTS IN SUPPORT OF THE DEFENDANT'S RECOMMENDATION

**A: MR. BARAHONA RODAS SHOULD RECEIVE A MINOR ROLE REDUCTION PURSUANT TO U.S.S.G. § 3B1.2(b)**

Pursuant to U.S.S.G. § 3B1.2(b), Mr. Barahona Rodas should receive a mitigating role adjustment of two levels because he was a minor participant in the criminal activity at issue in both of his federal cases. In the case at bar, Mr. Barahona Rodas was primarily

a courier who at the direction of others would deliver narcotics to customers of the organization and collect and transfer the proceeds of the sales. He was tasked with receiving cash proceeds from the narcotics sales arranged by others and pursuant to directions from higher-ups in the conspiracy, deliver and/or wire those proceeds to indicted and unindicted co-conspirators. In the case to be dismissed, Mr. Barahona-Rodas was an ounce-level sub-distributor for the lead defendant. The United States Sentencing Guidelines Section 3B1.2 provides:

> (a)   If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> (b)   If the defendant was a minor participant in any criminal activity, decrease by 2 levels
> In cases falling between (a) and (b), decrease by 3 levels.

In November 2015, the Sentencing Commission amended the mitigating role section because it found that role reductions were being "applied inconsistently and more sparingly than the Commission intended." *United States v. Quintero-Leyva*, 823 F.3d 519, 522 (9th Cir. 2016), *quoting* U.S.S.G. App. C. Amend. 794 (2015). The amendment was also aimed at addressing "caselaw that might discourage courts from applying minor role adjustments." *United States v. Diaz*, 884 F.3d 911, 915 (9th Cir. 2018). Under the amended guideline, when considering whether a mitigating role adjustment is appropriate, the defendant's relative culpability should be measured against that of other participants in the criminal scheme. *Id.* at 915-16. A reduction is appropriate where, as here the defendant is "substantially less culpable" than the average participant in the criminal activity at issue. U.S.S.G. § 3B1.2, Application Note 3(A). Determination of whether a four-level "minimal role," a two-level "minor role," or a three-level "intermediate adjustment" is appropriate is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of a particular case.

U.S.S.G. §3B1.2 Application Note 3(C). The minor role adjustment under subsection (b) "applies to a defendant…who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *U.S.S.G. § 3B1.2, Application Note 5.*

The amended guideline provides the following non-exhaustive list of factors to consider in determining the appropriateness of a role reduction:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

*Id*. Considering the above factors, Mr. Barahona Rodas should be granted a minor role adjustment under U.S.S.G. § 3B1.2(b), as he is less culpable than most others in both conspiracy cases.

Mr. Barahona Rodas was of course aware that Alejandro Roman Vasquez Amador and others in the case were distributing narcotics, He was paid as a courier. However, he had a minimal understanding of the day-to-day operations of the group. He did not participate in the planning or organizing of the group's large-scale distribution of narcotics. He took explicit instructions from Alejandro Roman Velasquez Amador and his father related to the delivery of narcotics and the collection and dissemination of narcotics proceeds. He had no decision-making authority, nor any ability to influence decisions made by the higher-level participants. He was picked up on a wiretap of Mr. Velasquez Amador's phone on February 1, 2021, receiving instructions on where to deliver approximately $19,000 in drug proceeds and was interdicted that day. Alejandro

Roman Velasquez-Amador, ostensibly Mr. Barahona Rodas' "boss," received a 2-level mitigating role adjustment and was ultimately sentenced to 57 months in prison. (see government's sentencing memo and Judgment at ECF #'s 251 and 265 respectively)

In the case to be dismissed, Mr. Barahona-Rodas, working with an unindicted co-conspirator, was a relatively low-level sub-distributor of methamphetamine for codefendant Rodrigo Diaz-Lopez. Mr. Barahona Rodas was picked up on a wiretap of Diaz-Lopez's phone beginning in early March 2021 until his arrest on March 12, 2021 ordering multiple ounces of narcotics, primarily heroin, from Diaz-Lopez. NArahona-Rodas was arrested when he arrived at Diaz-Lopez' residence just before case agents executed a search warrant at the residence. Mr. Barahona-Rodas is clearly less culpable than Rodrigo Diaz-Lopez. The court should grant the defendant's request for a two-level downward two-level mitigating role adjustment.

      **B:**      **THE CONDITIONS OF MR. BARAHONA RODAS' PRETRIAL CONFINEMENT**

Even before the COVID-19 pandemic, courts across the nation recognized that overly harsh conditions of a defendant's pretrial detention may be considered as a basis for a downward departure or variance from the advisory sentencing guidelines range. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).[1]  Courts have more recently

---

[1] See also: *United States v. Austin*, 309 F. App'x 573, 578 (3d Cir. 2009)(Affirming authority of District Court to consider conditions of pretrial detention in selectin within guidelines sentencing range.); *United States v. Roser*, 529 F. App'x 450, 453–54(6th Cir. 2013)( District court could consider conditions of pretrial confinement but defendant failed to preserve the issue); *United States v. Williamson*, No. ED-CR-13-00021-JLQ, 2013 WL 4677838, at *1–2 (C.D. Cal. Aug. 29, 2013)( It was appropriate to consider pre-sentencing conditions of confinement as a basis for 15th month downward departure.); *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003)(Case remanded to allow District court to consider conditions of pretrial confinement as a basis for downward departure.)

recognized that the Bureau of Prisons' institutional responses during the COVID-19 pandemic have resulted in the types of overly harsh conditions a sentencing court should consider when deciding to reduce a sentence. *See United States v. Scully*, 529 F. Supp. 3d 1190, 1192 (D. Or. 2021), and *United States v. Romero*, No. 15 CR. 445-18 (PAE), 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021).

      Mr. Barahona Rodas was arrested on March 12, 2021. While initially held locally he was soon transferred to the Federal Detention Center in Sheridan, Oregon. He remained there until shortly before his change of plea hearing on November 15, 2022. Though the pandemic has receded, with the last acknowledged outbreak at Sheridan occurring in January 2022,[2] widespread reports of dire conditions persist to this day. There have been rampant reports of inadequate access to medical care. *See Expert Report of Michael T. Puerini*, MD, CCHP-A, FACCP, Attached as Exhibit A to this memorandum.[3] *See also*,

https://www.opb.org/article/2022/02/11/oregon-prison-federal-sheridan-covid-inmate-death/

(As viewed 4/24/23). Through 2022 reports of deteriorating conditions persisted. There was an inmate hunger strike protesting conditions in June of 2022. *See*

https://www.opb.org/article/2022/07/05/sheridan-oregon-prison-prisoners-hunger-strike-federal-corrections-prison-conditions/ (As viewed 4/24/23). By the Summer of 2022

---

[2] See *Stirling v. Salazar*, 3:20-CV-00712-SB, Opinion and Order, ECF # 139 at 10 (D.Or 11/15/22). Social visits for inmates were suspended from January 6, 2022 through at least February 23, 2002, Stirling v. Salazar, Respondent's Supplemental Status Report, ECF # 104 at 2

[3] Filed as Attachment 1 to Petitioner's Status Report of February 2022, *Stirling v. Salazar, Id*., ECF # 98

numerous reports of staff violence against inmates were widely reported, leading the Federal Public Defender to seek a special master empowered to:

> gather facts, including by taking protected statements from residents of FCI Sheridan and reviewing government writings, and to provide the Court with recommendations addressing 1) whether adverse actions are being taken by BOP employees against complaining residents of FCI Sheridan and, 2) if so, what potential orders should be entered to protect FCI Sheridan residents from the appearance and reality of retaliation for exercise of First Amendment rights to speech and to access to the courts regarding their conditions of confinement.

*Stirling v. Salazar*, 3:20-CV-00712-SB, Plaintiff's Emergency Motion for Appointment of Special Master... 7/13/22 ECF # 113 at pp 1-2) *See also*, https://www.opb.org/article/2022/08/01/vicious-beatings-possible-retaliation-for-lawsuit-claimed-at-sheridan-oregon-federal-prison/ (As viewed 4/24/23). These reports were credible enough that Oregon Senators Ron Wyden and Jeff Merkley wrote a letter demanding answers from the newly appointed BOP Director. A copy of that letter is attached as Exhibit B hereto. Mr. Barahona reported that since the June hunger strike ended, his unit had been on almost constant 22-hour lockdown. He reported ongoing lack of access to medical care, substandard meals, and limited access to commissary items.

The court should vary downward in its sentence to reflect the overly harsh conditions of Mr. Barahona Rodas' pretrial detention.

### C: MR. BARAHONA RODAS' IMMIGRATION STATUS MAKES HIM INELIGIBLE FOR COMMUNITY CONFINEMENT, AND OTHER POTENTIAL SENTENCE REDUCTIONS.

Mr. Barahona Rodas has no legal status in this country. It is a virtual certainty that he will be deported to Honduras upon completion of his sentence. The United States Supreme Court has affirmed deportation's status as one, if not the most, severe

consequence resulting from a criminal conviction. *Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473 (2010)*. The Court referred to deportation as a "drastic measure," equating it to the ancient punishment of "banishment" or "exile". *Id., at 1478, and 1486 respectively (further citations omitted.)* The Court in Padilla clearly instructs us that deportation can no longer be thought of as a "collateral" consequence of a conviction to be given only secondary consideration. It is a fundamental, direct, and severe consequence of the conviction itself. In addition to the deportation that inevitably awaits him, Mr. Barahona Rodas' status will likely negatively affect both the circumstances and length of his sentence.

Mr. Barahona Rodas' status as a deportable alien is considered a "Public Safety Factor" by the Bureau of Prisons. *B.O.P. Program Statement P5100.08 (9/12/06 revision)*. This designation will prevent Mr. Barahona Rodas from serving his sentence at a minimum security facility. *Id*. He will be housed in at least a "low security" institution. *Id*. Minimum security B.O.P. institutions are commonly referred to as "federal prison camps". According to the B.O.P., they have dormitory style housing, a relatively low staff-to-inmate-ratio, and limited or no perimeter fencing. Low security institutions are work- and program-oriented. In contrast, low security institutions have double-fenced perimeters, dormitory or cubicle style housing and a higher staff-to-inmate ratio than minimum security facilities. *About our Facilities Page,* https://www.bop.gov/about/facilities/federal_prisons.jsp , *as viewed 04/24/23*. It requires no citation to authority to state that from the defendant's perspective, minimum security is the most desirable of B.O.P. placements. There is nothing about the defendant, his

history, or the charge of conviction that would otherwise bar him from consideration from serving his sentence in a minimum-security facility.

Moreover, Mr. Barahona Rodas' status as a deportable alien explicitly prevents him from participating in the Bureau of Prisons' early release procedures under 18 U.S.C. §§ 3621(e)(RDAP participation) and 3624(c)(Community Corrections Centers). *B.O.P. Program Statement P7310.04 (12/16/98 revision.)* As many B.O.P. prisoners near the completion of their terms, they are considered for placement in Community Corrections Centers ("C.C.C.'s")(also called Residential Re-entry Centers or "R.R.C.'s"), commonly referred to as "halfway houses." 18 U.S.C. § 3624(c) authorizes B.O.P. to place eligible inmates in a C.C.C. for a period not to exceed 12 months. Placement of eligible inmates into a C.C.C. is to give effect to Congress's directive in 18 U.S.C. § 3624(c) that B.O.P. affords the inmate a reasonable opportunity to adjust and prepare for safe re-entry into the community. As B.O.P. puts it,

> While clearly dangerous inmates should be separated from the community until completing their sentences, other eligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society.

*BOP Program Statement P7310.04 (12/16/98 revision.)* CCC's provide housing, structured programs, job placement, counseling, drug and alcohol testing, and close monitoring of the inmates. *Id*. Participating inmates also contribute 25% of their gross income to help defray the costs of their housing. According to the Bureau of Prisons these transitional halfway house programs provide benefits both to the participating inmate as well as to the community in which the inmates are ultimately released,

> Residential reentry centers (RRCs) are used by the BOP to place inmates in the community just prior to their release. RRCs provide a structured, supervised environment and support in job placement, counseling, and other services that facilitate a successful transition to the community. They make it possible for inmates to gradually rebuild their ties to the community and allow correctional staff to supervise offenders' activities during this important readjustment phase. Research has found that RRC participants are more likely to be gainfully employed and less likely to commit crimes when compared to inmates who release directly back to the community. During FY08, the BOP referred 29,690 inmates to RRCs and 91 percent of those admitted successfully completed the program. Of these, 15,446 inmates received transitional drug abuse treatment during that placement.

*U.S. Department of Justice, Federal Bureau of Prisons Publication, "State of the Bureau 2008", Page 9.* Mr. Barahona Rodas' status as a deportable alien does not make him a "clearly dangerous inmate." There is no information in his history that would lead anyone to believe he will become a "clearly dangerous inmate." His status as a deportable alien alone serves to deprive him and society of the benefits of a structured reintegration program afforded other similarly situated, but not deportable, inmates.

Mr. Barahona Rodas' status as a deportable alien also prevents him from being considered for an early release of up to 12 months for completion of the B.O.P.'s Residential Drug and Alcohol Program ("R.D.A.P.") because he will be ineligible to complete the "Transition Drug Abuse Treatment" component of the program which is offered in R.R.C.'s. *B.O.P. Program Statement P5331.02 (3/16/09 revision.)* The Director of the Federal Bureau of Prisons has described the R.D.A.P. program's value to both those who complete the program and to the release community:

> A rigorous evaluation of the RDAP demonstrated convincingly that offenders who participated in residential drug abuse treatment and were released to the community for at least three years were 16% less likely to be re-arrested and to have their supervision revoked (and be returned to prison)

than inmates who did not receive such treatment. This reduction in recidivism is coupled with a 15% reduction in drug use for treated subjects.

*Statement of Harley G. Lappin, Director, F.B.O.P., Before the U.S.S.C., Regional Hearing on the State of Federal Sentencing, W.D. Texas, Austin, Texas, 11/20/2009.*

Lastly, Mr. Barahona Rodas' status will prevent him from accumulating Earned Time Credits ("E.T.C.") under the First Step Act. 18 USC 3624(d)(4)(E). But for his status as a deportable alien, Mr. Barahona Rodas would be eligible to earn up to 10 days of E.T.C. for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. 18 U.S.C. § 3623(d)(4). These credits could then be applied towards early release. 18 U.S.C. § 3624(g).

    Mr. Barahona Rodas' status as a deportable alien thus precludes him from all avenues of sentence reduction except for the potential to earn 54 days off of each year imposed for satisfactory behavior available to all B.O.P. inmates. 18 U.S.C. § 3624(b)(1). He will almost certainly serve a longer period in prison than a similarly situated individual with lawful status in this country. The court should vary downward in its sentence to reflect this reality.

///

DEFENDANT'S SENTENCING MEMORANDUM -11

## V.     CONCLUSION

Given the unique circumstances of this case, and Mr. Barahona Rodas' personal history and characteristics, a sentence of time served is sufficient but no longer than necessary to achieve the goals of sentencing herein.

Respectfully submitted this 27th day of April, 2023.

*Andrew Kohlmetz*
Andrew M. Kohlmetz, OSB 955418
Attorney for Defendant Barahona-Rodas